IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

CHRISTOPHER G. AHERN,

     PLAINTIFF

     vs

THE CITY OF NEW YORK, a
municipal entity, NEW YORK
CITY POLICE OFFICERS DAVID
MARTINEZ, Shield # 6624, shown
initially as "JOE" MARTINEZ,and
SERGEANT CHRISTOPHER O'CONNELL,
Shield # 3290, shown initially as
"TOM" (?) O'CONNELL (?)/CONNELLY(?),
individually and in their official
capacities

     DEFENDANTS

14 Civ 1894 (RWS)(DF)
FIRST AMENDED
COMPLAINT AS OF RIGHT
[JURY TRIAL]

_____

I.  INTRODUCTION

1.  This is a litigation which arises out of the Plaintiff's unreasonable and unnecessary and legally unjustified stop and detention by Defendant New York City Police Officers Sergeant Christopher O'Connell, Shield # 3290, shown initially as "Tom" (?) O'Connell(?)/Connelly (?) and David Martinez, Shield # 6624, shown initially as "Joe" (?) Martinez, on Saturday February 8, 2014 at or about 4:30 P.M. in the Columbus Circle subway station, New York City, New York shortly after the Plaintiff had twice swiped his MTA issued Metro-Card into the turn-style at the afore-described location in order to enter into the subway, along with his wife and his stroller constrained and situated twenty month old son, so as to go to the uptown A train platform; and associated with the afore-described stop and detention, the unreasonable, unnecessary, and excessive utilization of force by the afore-described New York City Police Officers.

2.  This is an action in which the Plaintiff seeks relief for the violation of his rights as guaranteed under

the laws and Constitution of the United States and, as
well, under the laws and Constitution of the State of New
York.

3.   The Plaintiff seeks monetary damages and such
other relief, including injunctive relief and declaratory
relief [if appropriate], as may be in the interest of
justice and as may be required to assure that the Plaintiff
secures full and complete relief and justice for the
violation of his rights.

## II. JURISDICTION

4.   Jurisdiction of this Court is invoked pursuant to
and under 28 U.S.C. Sections 1331 and 1343 and 1367 in
conjunction with the Civil Rights Act of 1871, 42 U.S.C.
Section 1983, and the Fourth Amendment to the United States
Constitution and the laws and Constitution of the State of
New York.

5.   The Plaintiff requests that the Court invoke
pendent claim and pendent party jurisdiction.  The State
law claims derive from the same occurrence and transaction
which gives rise to the federal law claims and they have a
common nucleus of operative fact with the federally based
claims.

6.   The Plaintiff has complied with the State law
prerequisites required for the institution of a lawsuit
against the City of New York on his pendent State law
claims against the Defendant City of New York.

7.   The Plaintiff also invokes the jurisdiction of
this Court in conjunction with the Declaratory Judgment
Act, 28 U.S.C. Sections 2201, et seq., this being an action
in which the Plaintiff seeks, in addition to monetary
damages, whatever other relief is needed to provide full
and complete justice including, if appropriate, declaratory
and injunctive relief.

8. The venue for the prosecution of this litigation
resides in this District Court given that the event which
gives rise to the litigation occurred in the geographic
boundaries of this District Court; and given that the
Plaintiff resides within the geographic boundaries of this
District Court; and the Defendants have locations for doing

business within the geographic boundaries of this District Court.

9.   This is an action in which the Plaintiff seeks relief for the violation of his rights as guaranteed under the laws and Constitution of the United States and, as well, as guaranteed under the laws and Constitution of the State of New York.

### III. THE PARTIES

10.   The Plaintiff is an American citizen and resident of the City of New York, the County of New York, and the State of New York.

11.   The Defendant City of New York is a municipal entity which was created under the authority of the laws and Constitution of the State of New York and which, under the enabling law of the State of New York, has, among other powers, the power to maintain a police department for the purpose of enforcing the laws of the State and of the City of New York and providing for the safety of those individuals who live and/or traverse within the boundaries of the City of New York.

12.   Defendants David Martinez, Shield # 6624 shown initially as "Joe" (?) Martinez, and Sergeant Christopher O'Connell, Shield # 3290, shown initially as "Tom" (?) O'Connell (?)/Connelly (?), are New York City Police Officers and agents and employees of the City of New York.

13.   Although the actions and conduct the Defendant party Officers hereinafter described were unlawful and wrongful and otherwise violated the Plaintiff's rights as guaranteed under the laws and Constitution of the United States and as guaranteed under the laws and Constitution of the State of New York,  they were taken in and during the course of their duties and functions as New York City Police Officers and as agents and employees of the City of New York and incidental to the otherwise lawful performance of their duties and functions as New York City Police Officers and agents and employees of the City of New York and pursuant to the otherwise unlawful policies and practices of the Defendant City of New York.

14.   The real party in interest in this litigation is the Defendant City of New York and the Defendant Officers

are, in both their individual capacities as well as in
their official capacities, one and the same.

IV. ALLEGATIONS

15.   This is a litigation which arises out of the
Plaintiff's unreasonable and unnecessary and legally
unjustified stop and detention by Defendant New York City
Police Officers Sergeant Christopher O'Connell, Shield #
3290, shown initially as "Tom" (?) O'Connell(?)/Connelly
(?), and David Martinez, Shield # 6624, shown initially as
"Joe" (?) Martinez, on Saturday February 8, 2014 at or
about 4:30 P.M. in the Columbus Circle subway station, New
York City, New York shortly after the Plaintiff had twice
swiped his MTA issued Metro-Card into the turn-style at the
afore-described location in order to enter into the subway,
along with his wife and his stroller constrained and
situated twenty month old son, so as to go to the uptown A
train platform,; and associated with the afore-described
stop and detention, the unreasonable, unnecessary, and
excessive utilization of force by the afore-described New
York City Police Officers.


16.   The Plaintiff is Christopher G. Ahern.

17.   The Plaintiff is a resident of the City of New
York, the County of New York, and the State of New York.

18.   The Plaintiff is thirty one [31] years of age. The
Plaintiff's birth date is August 4, 1982.

19.   The Plaintiff resides at 1803 Riverside Drive,
Apt. # 4D, New York City, New York 10034.  The Plaintiff
has resided at that location since July 2013.

20.   Prior thereto, the Plaintiff resided in Oyster
Bay, Long Island, New York for approximately two years.

21.   The Plaintiff resides at his present residence
with his wife and his minor son.

22.   The Plaintiff is married and has been married
since September, 2009. The Plaintiff had been a long term
relationship with his wife since 2002.

4

23.  The Plaintiff's minor son is approximately twenty [20] months old. He was born in June, 2012

24.  The Plaintiff was born in New York City and he was raised both in New York City and in Nyack, New York (Rockland County).

25.  The Plaintiff graduated high school in 2000 where he was the captain of the cross country team and the president of his class.

26.  The Plaintiff attended Middlebury College in Vermont where he majored in Sociology-Anthropology and English and where he was awarded highest honors for his Senior Thesis.

27.  The Plaintiff graduated from Middleburg College in 2005 with a Bachelor of Arts degree.

28.  During his junior year in college, the Plaintiff was awarded a full scholarship to the Bread Loaf Writer's Conference.

29.  While in college, the Plaintiff worked for two summers in the Glacier National Park, Montana.  In addition and while in college, the Plaintiff worked on a Goat Farm for a three month summer vacation period.

30.  In addition and while the Plaintiff was in college, the Plaintiff studied abroad in Nepal for four months.

31.  Upon graduation from Middlebury College, the Plaintiff traveled to Mexico where he spent four months studying Spanish and where he volunteered at a Red Cross Clinic.

32.  From August 2006 to September 2007, the Plaintiff worked as a Head Wilderness Therapy Guide both in Idaho and in the Adirondack Mountains of New York State.

33.  In his capacity, the Plaintiff worked with at-risk teenagers who had been referred to the program of which the Plaintiff was a part. Those at-risk teenagers were referred to the program, of which the Plaintiff was a part, by Courts and/or Schools and/or the families.

34.   The Plaintiff returned to school in 2007 in order to pursue post Bachelor degree pre-med coursework, first at the City College of the City of New York and then at the University of Vermont.

35.   While at the University of Vermont the Plaintiff worked as a head research assistant in the laboratory of Doctor Kalev Freeman.   The Plaintiff was researching the effects of traumatic brain injury on the heart.

36.   From May 2009 through May 2011, the Plaintiff worked full time as a Medical Assistant at the Community Health Center in Burlington, Vermont.

37.   Commencing in August 2011 and given a committed interest and love of medicine, generally, and family medicine, specifically, the Plaintiff enrolled in medical school at the New York College of Osteopathic Medicine.

38.   The Plaintiff is currently in his third year at the School and is at present completing his core medical school related rotations at St. Barnabas Hospital in the Bronx, New York.

39.   As a student at the New York College of Osteopathic Medicine, the Plaintiff is trained in all of the standard and traditional medical school courses and practices.   In addition, the Plaintiff learns "hands-on modality known as osteopathic medicine which is utilized to address various muscular-skeletal and neurological issues.

40.   At the completion of his course studies at the New York College of Osteopathic Medicine, the Plaintiff anticipates pursuing a traditional post medical school residency in the area of family medicine.

41.   As previously set forth heretofore, the Plaintiff is married to his wife, Ellen, who is a professional dancer and choreographer; and they are the proud parents of their twenty month old son.

42.   This is a litigation which arises out of the Plaintiff's unreasonable and unnecessary and legally unjustified stop and detention by Defendant New York City Police Officers "Tom" (?) O'Connell(?)/Connelly (?) and "Joe" (?) Martinez on Saturday February 8, 2014 at or about 4:30 P.M. in the Columbus Circle subway station, New York

City, New York shortly after the Plaintiff had twice swiped
his MTA issued Metro-Card into the turn-style at the afore-
described location in order to enter into the subway, along
with his wife and his stroller constrained and situated
twenty month old son, so as to go to the uptown A train
platform; and associated with the afore-described stop and
detention, the unreasonable, unnecessary, and excessive
utilization of force by the afore-described New York City
Police Officers.


    43.  On Saturday February 8, 2014, the Plaintiff's wife
was performing in a production of Babar at the Allianz
Francis theatre which is located at 22 East 60th Street, New
York City, New York.

    44.  The performance was designed for children.

    45.  The Plaintiff and his son attended the afore-
described performance.

    46.  At the conclusion of the children oriented
performance, the Plaintiff, his wife, and their twenty
month old son proceeded to the subway station at Columbus
Circle where the intended to catch the A train and travel
to their residence on Riverside Drive, New York City, New
York.

    47.  The Plaintiff and his wife had a stroller with
them in which their twenty month old son was situated.

    48.  The Plaintiff, his wife, and their twenty month
old son (in the stroller), entered into the subway station
in order to get to the up-town A train platform.

    49.  As they approached the turn-style to enter into
the subway in order to get to the up-town A train platform
and as was the ordinary and normal approach which the
Plaintiff and his wife took when they had their son, in
stroller, with them and they were traveling on the subway –
which by the way was frequently—they signaled to the MTA
employee in the booth that they needed to access the
door/gate which was proximate to the turnstiles and which
allowed those with handicaps to gain entry into the subway.

    50.  The MTA employee in the toll both controlled
access to that door/gate proximate to the turnstiles and

would only allow such access to a patron of the subway if
and when the employee observed the individual, who was
seeking access, swipe the Metro-Card in the turnstile as
payment of the required fare.

51.   It was self evident that the Plaintiff and his
wife needed the access to the "handicap access door/gate"
proximate to the turnstiles in order to access the
stroller, in which their twenty month old son was situated,
into the subway so that, together, the Plaintiff and his
wife and son, in stroller, could go to the platform in
order to catch the up-town A train.

52.   Because the Plaintiff and his wife each was
required to pay a fare to go into the subway, the Plaintiff
and his wife swiped the MTA Metro-Card twice through the
turn-style as they showed the MTA employee they were doing
so and, associated therewith were requesting that the
door/gate proximate to the turnstile be opened to permit
them to take the stroller, with their twenty month old son
situated in it, into the subway.

53.   The MTA booth employee, having observed the
Plaintiff and his wife swipe the Metro-Card twice,
proceeded to buzz open the door/gate proximate to the
turnstile in which the Plaintiff and his wife had twice
swiped the Metro-Card.

54.   The Plaintiff's wife, who was pushing the
stroller, accessed through the door/gate first, heading
toward the stairs down into the up-town "A" train subway
platform.

55.   The Plaintiff followed his wife through the
door/gate and, once through the door/gate, remained at the
door/gate for a very brief period of time in order to make
sure that the gate/door completely closed behind him so
that others could not gain entry through such without the
MTA booth employee engaging the door and allowing the
access by buzzing the door/gate open and allowing the
individual through.

56.   As it was the door/gate appeared to the Plaintiff
to be a bit stuck so that he actually pulled the door/gate
shut.

57. Knowing that the stairwell to the platform was proximate to where he was situated and knowing that his wife was carrying the stroller, with son therein, down the stairs, the Plaintiff then quickly proceeded to the stair well with the intention of assisting his wife carry the stroller down the stair well.

58. The Plaintiff arrived at the top of the stairwell and observed his wife, with stroller (and their twenty month old son therein), a few steps below him on the stairs.

59. At the point that the Plaintiff was going to the stairwell and he was arriving the top of the stairs where he observed his wife with stroller (with their son situated therein) in the stairwell, the Plaintiff heard a voice, appearing to him to be coming from over his right shoulder, saying, in substance, hey buddy where do you think you are going?

60. The Plaintiff turned toward where the voice was coming and the Plaintiff saw a uniformed New York City uniformed Police Officers, state, again and in substance, where do you think you are going?

61. The afore-described event happened very quickly –a matter of seconds as the Plaintiff was moving very quickly to get to the stairwell in order to assist his wife with the stroller.

62. The Plaintiff pointed down the stairs where his wife could be observed –in response to the inquiry where he was going, and stated to the Officer, in substance and as he was pointing, my family's down there and I'm going to help with the stroller.

63. As two New York City Police Officers approached the Plaintiff, the Plaintiff, having informed the Officers of what he was doing, started down the stairs.

64. One of the Officers stated, in substance, where are you going? Why did you go through the door?

65. The Plaintiff responded, in substance, that both he and his wife had swiped the Metro-Card and that his family was down there and he was going to help with the stroller.

66.   The Plaintiff was continuing down the stairs so as to catch up with his wife and to assist his wife with the stroller.

67.   As he was taking the step to continue down the stairwell, the New York City Police Officers grabbed the Plaintiff by his arms restricting the Plaintiff's forward movement down the stairs to the location where the Plaintiff's wife was situated with the stroller (with their twenty month old son in the stroller).

68.   The Plaintiff was shocked as the physical actions taken by the New York City Officers came out of nowhere and without warning and the Plaintiff had done nothing whatsoever, by his physical actions, his words, or the tone or volume of his voice, to provoke the New York City Police Officers to physically grab the Plaintiff as they did.

69.   The Plaintiff called out to his wife "Ellen" as the Officers propelled him away from the stairs and forcefully propelled the Plaintiff up against the titled wall proximate to the stairwell.

70.   As they propelled the Plaintiff against the well, the Plaintiff asked the Officers, in substance, what they were doing and why are you doing this?

71. As they propelled the Plaintiff into the wall —face and chest inward toward the wall and against the wall, an Officer took the Plaintiff's right arm and forcefully brought it up and behind the Plaintiff's back so that the back of the Plaintiff's right hand was touching the Plaintiff's upper back near the Plaintiff's scapula.

72. Such was extraordinarily painful.

73. The pain was severe, excoriating.

74. The Plaintiff said, in substance, please stop, that is really hurting my shoulder.

75. Notwithstanding, the New York City Police Officers continued to hold the Plaintiff against the wall in the manner and fashion described including with his right arm bent backwards and upwards as described.

76.   The Plaintiff again tried to explain to the Officers that his family was down the stairs ahead of him and that he and his family had come through the door/gate after they had properly and appropriately swiped the Metro-Card twice in the turnstile and had been allowed to enter by the MTA booth employee who buzzed open the door/gate and allowed them access into the subway.

77.   At or about that time, the Plaintiff's wife had made her way back up the stairs with the stroller (and their twenty month old son situated therein).

78.   The Plaintiff's wife appeared to be very up-set and asked the Officer, in substance, what are you doing to him—what is going on?

79.   After the Plaintiff's wife arrived and expressed herself as described, the Officers let up with the unreasonable and excessive and unnecessary force as being applied (as described).

80.   The Officers then informed the Plaintiff that they believed the Plaintiff had snuck in through the door/gate without having paid his fare, this notwithstanding that the Plaintiff had already explained that such was not the case.

81.   The Plaintiff's wife endeavored to explain to the Officers what has transpired—in substance, that they had swiped the Metro-Card twice at the turnstile

82.   Since the Officers—and especially and particularly New York City Police Officer Martinez, continued to be accusatory, aggressive and unapologetic, the Plaintiff's wife suggested that the Officers take the Metro-Card, which they had swiped twice to gain entry into the subway when the MTA booth employee buzzed the door/gate and gave the Plaintiff and his wife access into the subway with their stroller through the door/gate, and go check with the MTA booth employee to confirm that what the Plaintiff and his wife were saying was the truth.

83.   New York City Police Officer Martinez took the Metro-Card and went to the MTA booth leaving the Plaintiff in the custody of New York City Police Officer Sergeant O'Connell, shown initially as O'Connell(?)/Connelly (?).

11

84.   While detaining the Plaintiff, Officer Sergeant O'Connell, shown initially as O'Connell (?)/Connelly (?), stood with his right hand on the butt of his holstered gun.

85.   The Plaintiff's wife was frightened by such and felt threatened by such, particularly because their twenty month old son was situated in the stroller; and the Plaintiff's wife asked that the Officer not stand in that manner and fashion because she felt intimidated and that it was unnecessary to do so.

86.   After some minutes, New York City Police Officer Martinez returned and confirmed that, as the Plaintiff and then the Plaintiff's wife had stated to the Officers, the Metro-Card had been utilized and swiped twice some minutes before.

87.   The Plaintiff was released and the Plaintiff and his wife, along with their twenty month old son in the stroller, left and proceeded to go down the stairs to the up-town "A" train subway platform.

88.   It is believed that the Plaintiff's stop and detention was part of a New York City Police Department "fare beating"/quality of life field operation which was undertaken by the police and which caused the Plaintiff to be stopped and detained and subjected to force although the Plaintiff had not done anything which any reasonable person, including law enforcement agents, could have reasonably and objectively suspected or believed to have been criminal in nature or otherwise unlawful.

89.   There was no specific or particular information available to the police officers that the Plaintiff was engaged in any unlawful activity and he was stopped, detained without any objectively reasonable suspicion or belief for such as is required under the law for a proper stop and detention.

90.   The Plaintiff committed no criminal offense or other offense whatsoever and no reasonable police officer could have believed that the Plaintiff committed any criminal offense or any other offense under the law to justify his stop and detention or to justify the utilization of the unreasonable, unnecessary and excessive force applied to the Plaintiff associated with his stop and detention.

91.  There was no basis for the stop and detention of the Plaintiff by the afore-mentioned New York City Police Officers.

92. There was no basis for the utilization of the force applied to the Plaintiff by the afore-mentioned New York City Police Officers.

93.  While the actions and conduct of the New York City Police Officers were unlawful they were taken in the course of their duties and functions and incidental to the otherwise lawful performance of those duties and functions as New York City Police Officers and as an agents and employees of the City of New York.  It is believed that the New York City Police Officers who engaged in the afore-described conduct were Officers David Martinez, Shield # 6624, shown initially as "Joe"(?) Martinez, and Sergeant Christopher O'Connell, Shield # 3290, shown initially as "Tom"(?) O'Connell (?)/Connelly (?).

94.  There was no objectively reasonable suspicion or belief for the Plaintiff's stop and detention by the afore-described Police Officers.

95.  There was objectively reasonable basis for the utilization of the force applied by the afore-described Officers to the Plaintiff when he was stopped and detained.

96.  The Plaintiff was unreasonably stopped and detained and was subjected to excessive and unreasonable and unnecessary force associated with the stop and detention.

97.  It is believed that the actions and conduct herein described were propelled by the "open-widows", quality of life,/fare beating crime offense enforcement initiatives of the City of New York which is grounded in the philosophy of the "ends justifies the means".

98.  Such crime offense enforcement initiative propels officers to stop and detain when there is no basis for the stop and detention of individuals and, by such, to generate arrest statistics and to otherwise make examples of individuals in the hope that such would depress actual crime or other unlawful conduct by individuals who might be

inclined to engage in such criminal or otherwise unlawful conduct.

    99.  In that regard and as reported in a February 28, 2014 New York Daily News article, the New York City Police Commissioner William Bratton, in defending the targeting of $2.50 fare cheats as part of a crime fighting strategy dating to his 1990's New York tour of duty", stated: "Some people might say, 'Why are you worried about that?" "the 'New York miracle,', if you will,  began with fare evasion. Twenty-five years later, 'we're still at it."

    100.  The New York Times reported in a March 5, 2014 article that Police Commissioner Bratton, "speaking at a breakfast meeting of business leaders at the Waldorf Astoria" on March 4, 2014, "signaled that he intended to model his patrol strategy on the 'broken windows' theory, much as he had at the beginning of his previous tenure as the city's police commissioner in the mid-1990…"  Speaking to the "broken windows" policy, Bratton is quoted as saying: If you take care of the little things, then you can prevent a lot of the big things".

    101.  Continuing in this regard he is reported to have stated: "That has been the foundation of my policing strategy", which, as summarized in the Times article "holds that maintaining order and curbing low level violations help reduce more serious crime.

    102.   The Times reported that Police Commissioner Bratton said that the "broken-windows policing theory", "works and it will remain a cornerstone of the policy" of the New York City Police Department.

    103.   Finally and according to the New York Times which summarized the Commissioner's position, stated that "he [the Police Commissioner] intended for his officers to aggressively enforce the law against low-level offenders to ensure that public places feel safe."

    104. As a consequence of the foregoing quality of life/"broken-windows" policing policy and strategy and practice, it is believed that New York City Police Officers are propelled to achieve certain "goals" relative to arrests for minor quality of life/"broken-windows" type offenses including fare evasion offenses; and therefore to make low level, quality of life/"broken-windows" offense

arrests and thereby in order to achieve those arrest goals,
New York City Police Officers are driven to make
objectively reasonable stops and detentions and/or to make
objectively unreasonable probable cause lacking arrests for
those minor quality of life/"broken-windows" crime offenses
including objectively unreasonable stops and detentions
and/or objectively unreasonable probable cause lacking
arrests for alleged fare evasion offenses; and, associated
with such objectively unreasonable stops and detentions
and/or objectively unreasonable probable cause lacking
arrests, cause New York City Police Officers to be over-
zealous and rude and to utilize unnecessary and
unreasonable and excessive force (including, as a
consequence of the objectively unreasonable stop and
detention of the Plaintiff and including the objectively
unreasonable and unnecessary and excessive utilization of
force against the Plaintiff associated therewith—as
described previously herein).

105.  The Plaintiff's was unlawfully stopped and
detained and he was subjected to excessive and unreasonable
and unnecessary force.

106.  The actions, conduct, policies and practices and
customs herein described violated the Plaintiff's rights as
guaranteed under the Fourth Amendment to the United States
Constitution and the Civil Rights Act of 1871, 42 U.S.C.
Section 1983.

107.  The actions, conduct, policies and practices, and
custom violated the Plaintiff's rights under the laws and
Constitution of the State of New York including the stop
and detention of the Plaintiff and the assault and battery
committed against the Plaintiff in conjunction with the
stop and detention.

108.  The actions, conduct, policies and practices and
customs were negligent and otherwise the proximate cause of
the injuries and damages suffered by the Plaintiff.

109.  The Plaintiff suffered injuries and damages
including loss of liberty, fear, anxiety, mental distress,
emotional anguish, embarrassment, humiliation, and
psychological trauma and physical pain and suffering.

110.  The Plaintiff continues to suffer residual
emotional anguish and physical pain, the latter of which

has required him to seek out medical services and treatment from health care providers and to obtain a prescription for the pain attached to the injury that was inflicted as a direct result of the unnecessary, unreasonable and excessive force applied to him by the afore-described New York City Police Officers under the circumstances as described herein.

111.   The Plaintiff has not yet placed a monetary value on the damages which he incurred although he believes them to be substantial and to include compensatory and punitive damages.

112.   The Plaintiff has no other adequate remedy at law but for the institution of this litigation.

### V.   CAUSES OF ACTION

#### A.   FIRST CAUSE OF ACTION

113.   The Plaintiff reiterates Paragraph #'s 1 through 112 and incorporates such by reference herein.

114.   The Plaintiff was unlawfully stopped and detained in violation of his rights as guaranteed under the Fourth Amendment to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

115.   The Plaintiff suffered injuries and damages.

#### B.   SECOND CAUSE OF ACTION

116.   The Plaintiff reiterates Paragraph #'s 1 through 115 and incorporates such by reference herein.

117.   The Plaintiff was unlawfully stopped and detained in violation of his rights as guaranteed under the laws and the Constitution of the State of New York.

118.   The Plaintiff suffered injuries and damages.

#### C.   THIRD CAUSE OF ACTION

119.   The Plaintiff reiterates Paragraph #'s 1 through 118 and incorporates such by reference herein.

16

120.   The Plaintiff was  subjected to unnecessary, unreasonable and excessive force in violation of his rights as guaranteed under the Fourth Amendment to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

121.   The Plaintiff suffered injuries and damages.

### D.   FOURTH CAUSE OF ACTION

122.   The Plaintiff reiterates Paragraph #'s 1 through 121 and incorporates such by reference herein.

123.   The Plaintiff was subjected to assault and battery and unnecessary, unreasonable and excessive force in violation of his rights as guaranteed under the laws and Constitution of the State of New York.

124.   The Plaintiff suffered injuries and damages.

### E.   FIFTH CAUSE OF ACTION

125.   The Plaintiff reiterates Paragraph #'s 1 through 124 and incorporates such by reference herein.

126.   The policies, practices and customs herein described propelled the actions and conduct herein. Those policies, practices, and customs violated the Plaintiff's rights under the First, Fourth and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

127.   The Plaintiff suffered injuries and damages.

### F.   SIXTH CAUSE OF ACTION

128.   The Plaintiff reiterates Paragraph #'s 1 through 127 and incorporates such by reference herein.

129.   The actions and conduct and policies, practices and customs herein were negligent and otherwise violated the Plaintiff's rights under the laws and Constitution of the State of New York.

130.   The Plaintiff suffered injuries and damages.

### G.   SEVENTH CAUSE OF ACTION

131.   The Plaintiff reiterates Paragraph #'s 1 through
130 and incorporates such by reference herein.

132.   Pursuant to and under pendent State law and
pendent State claim jurisdiction and independent of the
federally based claim against the Defendant City of New
York, the Defendant City of New York is responsible, under
State law claims, for the actions and conduct of its
Defendant Officers, as employees and agents of the
Defendant City of New York, pursuant to the doctrine of
respondeat superior.

133.   The Plaintiff suffered injuries and damages.

### H.   EIGHTH CAUSE OF ACTION

134.   The Plaintiff reiterates Paragraph #'s 1 through
133 and incorporates such by reference herein.

135.   When the City of New York represents its Officers
in federal civil rights litigations alleging
unconstitutional actions by its officers (which is almost
always the case in 99.99 percent if not more of the
situations where an Officer seeks representation), it is
believed that it ordinarily and uniformly and as a matter
of policy and practice indemnifies its Officers for any
award of both punitive damages and compensatory damages.

136.   It is believed that the Officer-employee executes
a retainer indemnification and representation letter which
requires the Officer-employee, in return for
indemnification, to subordinate his or her interests to the
interest of his/her employer and indemnifier –the Defendant
City of New York.

137.   It is believed, moreover, that, when a judgment is
obtained against a New York City Police Officers for an
Officer's violation of an individual's federally guaranteed
Constitutional and civil rights and where the Officer has
been represented by the New York City Attorney's Office and
where the City of New York has paid the judgment of damages
(compensatory and/or punitive damages), the Officer almost
never has been subjected to a New York City Police
Department disciplinary hearing and/or the imposition of
discipline; and it is believed that, when a settlement has

been made in such a litigation, the Officer ordinarily is
never even informed of such.

138.   The City of New York is, under the circumstances,
the real party in interest.

139.   The named and unnamed individual Defendants are
employees and agents of the City of New York and their
conduct, as described, was taken in the course of their
duties and functions as New York City Police Officers and,
in their capacities as such, as agents and employees of the
City of New York.

140.   Their actions and conduct, while unlawful and
unconstitutional, nonetheless were actions and conduct
taken to the otherwise lawful performance of their duties
and functions as agents and employees of the City of New
York.

141.   The Plaintiff is entitled to recover against the
City of New York for the conduct of its named and unnamed
Officers under the federal claim jurisdiction pursuant to
the doctrine of respondeat superior.

142.   The Plaintiff suffered injuries and damages.

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

[a] Invoke pendent party and pendent claim jurisdiction.

[b] Award appropriate compensatory and punitive damages.

[c] Award appropriate declaratory and injunctive relief.

[d] Empanel a jury.

[e] Award attorney's fees and costs.

[f] Award such other and further relief as the Court deems to be in the interest of justice.

DATED: New York, New York
       July 1, 2014

Respectfully submitted,

/s/James I. Meyerson____
JAMES I. MEYERSON
1065 Avenue of the Americas
Suite # 300 (c/o NAACP)
New York, New York 10018
[212] 344-7474/Extension 129
[212] 409-8890 (E-FAX)
jimeyerson@yahoo.com
ATTORNEY FOR PLAINTIFF
BY:_____

20